Good morning to this panel. My name is Stanley Gibson. I represent Royal Insurance, Continental Insurance, and Greenwich Insurance in appealing the grant of the petition of the limitation of liability to the Western Pioneer under the limitations statute. We have a little housekeeping issue because my colleague, Mr. Teresky, is also appealing on behalf of Int'l Specialty Lines on a summary judgment motion that was granted under the anti-subrogation rule that doesn't have anything to do with the limitation issue. And if the Court would indulge me a little bit, we might run over. I would seek the Court's indulgence on that. Have you agreed to split your time? We have agreed to split our time, and I would like to reserve three minutes for rebuttal. Keep your eye on that clock there. The limitation statute was passed in 1850. You don't see many of them reach the appellate courts, the decisions granting limitation, because very few are granted anymore. That statute was passed to prevent U.S. capital from flowing to Great Britain, which had a limitation act in building ships. They wanted to keep American capital here for American ships. What's important in this action is there are no disputed facts below. The facts are agreed. The findings of fact entered by the judge below, we do not dispute. It is the conclusions that he drew from those facts which are disputed, and that is reviewable de novo. Most importantly, the Court found that the master felt tired before he left. That's a finding of fact. It's not disputed. The Court also found that Western Pioneer had a policy of leaving it up to the master to decide whether to spend the night at home dock or take off on his voyage. It is undisputed that the master was new to that vessel. He had never been on that vessel before. It's undisputed he was up at 3.30 a.m. Most importantly, the port captain and general manager admitted in cross-examination at trial, citing the brief, that a contributing cause to the collision was the captain's tiredness. That collision occurred three hours after he left his home dock, still here in Puget Sound, on a clear night. Good radar target, and ran into the barge like he'd like, causing about three minutes. What was the, if it had a policy, what was the employer's policy about, you know, captains in that situation? Did they have a policy? Yes. Yes, Your Honor. Their policy was one of ignorance. Their policy was to delegate it, to delegate everything to the master. The policy was, and I would put it, quoting the port captain, you indicated 98% of the time the masters took a nap. How did you know whether or not the master had taken a nap? You're supposed to sleep during the day while they're fueling? They were big boys. I left it up to them. What kind of a policy do you think the owner of the vessel ought to have? The owner of the vessel is obligated, and we're talking here not just about negligence. We are talking about trying to take advantage of the limitation to limit its liability to the value of the vessel. We have a lot of those in the Fifth Circuit. I know, Your Honor. You still get some of them in the Fifth Circuit. I'm aware of that. It's an active circuit in that area. The point is they knew what the master was. They knew he'd been up. All they had to do is say, Captain, new vessel, don't leave at night. Spend the night. Get a good night's sleep, period. I mean, did your master kind of rule that, well, you've got to get X number of hours of sleep before you can take a ship out? Absolutely. If they wanted to take advantage of the limitation. I'm aware of that. I mean, you know, have somebody there and watch the guy fall asleep or just have him certified, I fall asleep at 8 p.m. or what? The point is, Your Honor, they didn't have any policy except ignorance here. You've got to do more than put your head in the sand. This Court has held you don't want to reward imbecility on the part of owners. You don't want to reward that. They have got. Well, you put your head in the sand when, you know, it's sort of like the deliberate ignorance. If you know something is going on around you that you want to ignore. But, you know, there's no evidence in this record. Is there that, you know, as a matter of matter, of course, in a matter of practice, captains are always falling asleep at the wheel. That's not what that's not what's required, Your Honor. No, no. But you said put your head in the sand. They did put their head in the sand. They left it totally up to the master. And they are responsible if they want to take advantage of limitation statute. And it's their burden. It is their burden. It's not my client's burden. It's their burden to take advantage of limitation statute to prove that his tiredness was not a contributing cause to that accident. This Court has held it's not an actual knowledge standard. It is the standard of what the owner could have found out on reasonable inquiry, what they are charged with. The question of care and privity. Yes, Your Honor. Now, if you assume, if we assume that, you know, the captain's lack of sleep, we'll say the master's lack of sleep or that he had lack of sleep. Is there a cause? Does the evidence establish a causal connection? Absolutely, Your Honor. Absolutely. First of all, the. What was the finding? There was no finding on this. And this is where the trial court committed its error of law. Because clearly in finding of fact number 11, the court said per petitioner's policy, per Western Pacific's policy. I'm sorry, 11? Finding of fact 11. This is court record 63, excerpt number 9. Yes. Finding of fact 11 is where the, it is the fundamental error made by the lower court. Because decided unilaterally to depart for Alaska per petitioner's policy, he had discretion to remain. That policy does not comply with this court's law on limitation of liability to take advantage of it. Because the owner, while that vessel is at the home dock, has control and is absolutely responsible for when it leaves. And the expert testimony presented at trial said you could have predicted at 8 p.m. given what this man had to do that day, new vessel, he had been up since 3.30 a.m. arriving from Long Beach, California. You could have predicted that that vessel was unseaworthy when it departed. And guess what? Three hours later, you had a horrendous collision.  $3 million worth of damage. This evidence, what really this boils down to is the burden of proof. This evidence was unrebutted. The port captain admitted, that's also in evidence, the port captain admitted that one of the contributing causes to the collision was the captain's tiredness. This is the port captain who left it up to the tired master to decide whether or not he's too tired to go. A vessel owner seeking to limit their liability to the value of their vessel when they cause a horrific accident cannot do that and limit their liability. They have a much higher standard while they have control. And those are unrebutted. Now, that's why the burden of proof becomes so important. In the briefs, we all agree on the burden of proof. It's on the petitioner to prove that that tiredness did not contribute to the accident. What was the evidence after the barge owner, my clients, put on their evidence to show tiredness caused the loss? Nothing. Nothing. Western Pioneer rested. And now they attempt to dredge up something in a deposition. It's really not in the record. It's their only point. But they are looking at the captain's conduct. What this court needs to look at and what the Limitation Act looks at is the owner's conduct. I think it would be a terrible mistake for this court to expand the limitation statute to encompass the big boy standard, as I call it. The captain's a big boy. We're going to leave it up to him. If he leaves when he's too tired, we are only liable for the value of our vessel. That is not the law. Counsel for Western Pioneer, understandable, did not even discuss in their rebuttal the state's teamship case decided by this court, the Limitation Action, in 1958. You are implying it may be actual knowledge. What could they do to find out? This court has said, within the meaning of the section of the statute limiting liability, knowledge means not only personal cognizance, but also the means of knowledge of which the owner or his superintendent is bound to avail himself of contemplated loss or condition likely to produce or contribute to loss, unless appropriate means are adopted to prevent it. The measure in such cases is not what the owner knows, but what he is charged with finding out. Should they be there when they know he's been up to 3.30 a.m. in the morning, his first time on that vessel, and he's going out at night to say, Captain, you can't go? Absolutely. Absolutely. What is 12 hours going to make? Did the district court determine that his lack of sleep or his tiredness or his fatigue was approximate or one of the contributing causes of the accident? It was never mentioned again, Your Honor. After the finding of fact number 11, he said, although he felt tired, he unilaterally decided. It was quite clear to me. Well, the district court, when it assessed all the evidence that had been presented at trial, as I recall from when I read this, that he concluded, or whoever the district court was, concluded that it was the negligence on the – Sure. I mean, right before the accident. Sure. About not keeping – he was not in a proper position at the lookout. Certainly. Didn't have a post. Totally consistent with the tire cap, and he had his back to the windows when the collision occurred. He was riding in his log. He was riding in his log. He lost complete track of time, and we presented evidence that that was due to his fatigue. The captain admitted it on the stand. He said, I lost situational awareness. I guess that's a politically correct way of saying negligent. He lost situational awareness, and there was no rebuttal that that didn't cause it. I believe the trial judge made a mistake because he – I believe the trial judge made a mistake because he didn't make a complete finding. But the district court did make a finding, as I read the – when I was reading this, that the sole proximate cause of Bowfinn's collision with the lucky buck and the damage to the lucky buck was the spontaneous, negligent navigational errors of Nassar Morris. Correct. And those spontaneous navigational errors were due to his fatigue. The court found that he felt tired, and he never eliminated that from the equation. He never said his tiredness, they have sustained their burden, that his fatigue did not contribute. That is where the error – because he had eliminated it because he thought this policy was lawful, and that's why it never comes up again. And this court can't allow a vessel owner to send a captain to sea tired. We're not talking about navigational negligence that occurs thousands of miles away. We're talking about a vessel within three hours of its home port. And we're talking about taking advantage of the limitation statute that no other entities in this country get to take advantage of. It's a very heavy burden. And I would like to reserve the rest of my time for rebuttal, unless there are more questions. Now, you've got to give something to your co-counsel. I am. You can't reserve for rebuttal, then. Well, he's going to take five minutes. It depends on how much he uses. Well, we've talked. Thank you. You're not co-counsel, actually. We're not co-counsel. May it please the Court. I'm Matt Cheredsky, and I am here on behalf of ISI. And in order to give Mr. Gibson his three or four minutes of rebuttal, I will only use three or four minutes and can do that to address what I consider the critical distinction.  My client was dismissed on summary judgment because it, under the anti-segregation rule, had that not been done, we would have had the same interests as Mr. Gibson's client at trial. And so in just about all respects and — He lives in Houston. That's right. And I agree with everything he said. With respect to the anti-segregation rule, whether it's segregation or the anti-segregation rule, these are all done on a case-by-case basis, and it's an equitable doctrine. This is a classic segregation case. All of the implications in terms of insurance companies recovering from other insurance companies whose insurance are at fault are applicable here. The anti-segregation rule — Counsel, whether you call it anti-segregation rule or not, I just don't understand. You sue an insured that you have coverage for liability, and you turn around and sue your own insured for a half a million dollars. I just don't follow that. Subrogation or no? Your Honor, I would not be — my client would not be entitled to do what you say if one of two things existed. If we were seeking reimbursement for the funds that we paid, which we are not doing because those funds were tendered immediately and they were — the insurance — I understand that. You pay policy limits. I understand. But you've got a duty to defend your liability cover. You've got an obligation to defend that insurance, whether you pay policy limits or not. That's — with all due respect, Your Honor, that's inconsistent with the facts below. The facts at the district court were that all obligations of the insurance company — and this is in a stipulation between the parties — all obligations of the insurance company were met. Including the obligation to defend? By tendering the defense — by tendering the limits, we — my client no longer had the duty to defend. Now, that's new. I have never heard of an insurance company obtaining release from its duty to defend simply by paying the limits of its policy coverage. It's — Never heard of that contention before. You have a case that — In 60 years of practice of law. You have a case that clearly holds that, right? It hasn't been briefed because it was stipulated too below that the obligations of the insurance company were met. That — the tendering, the obligations being met are uncontested. And the third thing that's uncontested is that there was no conflict of interest in this case. With only approximately a minute left, let me just make the key distinction between the cases cited by ISI, about eight cases, and all of them say that the anti-segregation rule is only implicated under the circumstances I've indicated. Western Pioneer's cases — Western Pioneer would have this Court apply that anti-segregation rule where there are potential — broadly, as if — because there are circumstances, aside from this case, where conflicts of interest may not exist. That's not what those cases hold. Cases Western Pioneer cites say that the rule applies where there is a potential — a potential for bad faith because the conflict of interest does exist. This — this case, the conflict of interest does not exist, and so there is no potential for bad faith. And that's the key distinction between the cases. Applying the anti-segregation rule here would be contrary to the intentions of the insurance companies in — with respect to the insurance on the Bowfin and contrary to how the segregation rule works. Thank you. All right. May it please the Court. Thank you. I'm Don McLean again, and I'm representing Western Pioneer. I do think it's important to just briefly outline the facts of the case leading up to the collision because I do think it explains everything and also explains the Court's findings. At 11 o'clock in the morning, Doug Morris arrived in Seattle, Western Pioneer. He had been off duty for a while, should have been sufficiently rested. He arrived at work. An inquiry was made of him as to how he was feeling. He said he was feeling okay. It never indicated that he had any problem whatsoever. At 12.40, the vessel is supposed to move to the fuel dock. Fueling can take between six to eight hours, and the policy of Western Pioneer is that the master takes a nap during the six to eight hours so that he is well enough rested to leave. The fact of the matter is it's impossible for a person to go there and make sure he takes a nap. That's what the policy is, and that's what the manager was saying, is that basically they're supposed to take a nap. In this case, Doug Morris, in fact, did take a three and a half hour nap. At 8.05 in the evening. I remember that, counsel. There was a policy of the ship owner to have the captain take a nap? Yes, it was. That's what Gabrielle Reisinger said. Why? That is what the captain's report said, that there was a policy for the captains to take a nap while the boat was fueling. The ship owner's policy? Yes. Is that in the findings? I don't think it's in the findings, but it's in the record. It's in the findings, fact number 10. Thank you. All right, thank you. When the vessel left, 8.00 was supposed to go directly from the fuel dock out into Puget Sound. Unfortunately, they left a spreader bar behind, so they had to run back to Western Pioneer. This was at 8.00 on a Friday evening. They were over there. There was no management-level personnel there. Management-level personnel didn't even know they'd be returning. At this point in time, Doug Morris indicated that he felt tired, but that he thought he could do the job. He testified that if someone had asked him if he was able to do the job, he would have responded, yes, I'm fine, I have no problem. Basically, what he was saying is that he was able to do the job. Although he was tired, he felt that he could do what was necessary of him. That was when he left the dock. Because if he didn't feel that way, he was entirely responsible to take a nap and leave the next morning. The determination of how tired someone is can only be made by that person. The vessel then left the Western Pioneer dock and headed out into Puget Sound. This happened in the summer. It was a clear summer night. Weather was nice. There was absolutely no wake whatsoever. As he was leaving the locks, he noticed the Lucky Buck in the vessel traffic line. The Lucky Buck is a huge barge processing vessel. It was the second tow of a tandem tow, and it made an excellent radar target. As he was approaching it, approximately 20 minutes beforehand, he planned to pass on its port side. This was probably a mistake, as Captain Muhlenberg indicated, because of the path of the vessel traffic. When it turned, it would cause the Lucky Buck to actually swing into the path of the bowfin. But this was not a very complicated maneuver to overtake a vessel. He had nothing else to worry about. All he had to do was overtake the vessel. Counsel, I don't know why I hear you talking about this. The master was grossly negligent. You can't argue otherwise. We admitted that he was grossly negligent. I think what I'm trying to prove is that the things he did during the 20 minutes when he should have been taking care of the vessel are such that it indicates that he wasn't too tired to steer the boat. I thought he testified something to the effect that he blacked out or he was unaware briefly of what was happening. I think what happened was he planned the autopilot, and then he decided to do other things. He checked the GPS. He looked at the tide table on the computer. He talked to the deckhand that came in. And he basically was actually writing in the logbook at the time. I mean, he basically just didn't do his job. There was no indication that he blacked out, that he fell asleep, that he was in any way too tired to perform a fairly simple operation. And I think the standard of review is very important in this case. And despite protestations of underwriters, it's on a clearly erroneous standard. The findings that are pertinent that the Court must reverse, must find to be in clear error, are that the sole proximate cause of the collision was the spontaneous navigation of the captain. Well, you know, as Mr. Gibson says, he's not really challenging the underlying findings of fact. I mean, he's challenging, you know, what the district court concluded from those findings. Well, the determination of the fact that the district court, I guess, refused to draw the inference that what the findings call these plantation spontaneous navigational errors were caused by the captain's masters, you know, lack of situational awareness because he didn't have enough sleep. And and the owner should have known that that would happen to anybody who didn't have enough sleep. Right. Well, I think that those are legal conclusions you draw from the facts. Well, the determination of what the proximate cause is, is a issue of fact. And he said the issue of fact was the negligent navigation, not the tiredness. It was specifically argued to the Court below that the tiredness caused the collision. The Court rejected that and said, no, the sole proximate cause was the negligent navigation. What the Court, what he's trying to do now is the saying that, well, the tiredness must have played some part. But that is not what the Court held. The Court held the negligent navigation is what caused the accident. And as I explained earlier, they're saying that there's no evidence that disputes the fact that he was tired. Well, he said he felt tired. As I was trying to explain with the facts that he did leading up to the collision, he had enough mental acuity to be able to do this task at hand, which was to pass a barge that he saw. He didn't have to do anything else. He had 20 minutes. The only thing he had to do was pass the barge. And for whatever reason, he didn't do that at all. Instead, he did things that require mental acuity that he could have used. He didn't focus on the right task. The only task he had to focus on is the one he didn't. And there's no indication that he was too tired to be able to focus on that task. So getting back to the burden of proof, the burden of proof in limitation cases is fairly clear. It's on the claimant's, in this case, underwriter's, burden to prove the specific acts of negligence or unseaworthy condition that caused the loss. It then shifts to Weston Pioneer to show that those negligent conditions, the specific negligent conditions and unseaworthy conditions, were not within its knowledge and privity. The other finding that I do think is fairly important for the court to realize is the court found that the master was competent and the vessel was seaworthy when it left the port. It didn't say he was too tired, that that rendered the vessel unseaworthy when it left the port, as was invited by the plaintiffs in the trial court. They're trying to second-guess the factual determinations of the trial court because there's one sentence that says the guy felt tired. I feel tired. I do think I can do normal tasks that are required for my job. Furthermore, Weston Pioneer did use due diligence to make sure that their captains were seaworthy when they left. They required them to sleep while they were getting fuel, and they allowed them the choice to stay in port if they were too tired. If they felt they were too tired, they could stay. As indicated earlier, the only way a person can indicate whether or not they're too tired is if they know. Doug Morris was familiar with his job. He knew his obligations. He'd been sailing for Weston Pioneer for a year and a half. He knew what he needed to do, and he knew his physical condition. There's no evidence whatsoever that he appeared tired. He indicated to anyone he was tired. As a side, a short aside, Bill Clark, who arrived in the deck, arrived in the wheelhouse moments before the collision and talked to him, his testimony was actually before the court. It was basically agreed to between the parties at the trial, and the court did, in fact, read it, and therefore it is part of the record and is appropriate for the court on appeal. Was there any evidence in the record that there were any deadlines that the captain had to meet in arriving at his destination? No. At that point, the general manager specifically testified to the opposite, that there is no real deadline and that, if necessary, they can spend the night at the dock. In fact, that had happened on previous occasions. There was one occasion, actually, where she explained that the captain actually went through the locks and at that point in time realized, you know, I don't feel comfortable here, turned around and came back and slept at the dock. You have to remember this is a Friday night. They kind of have a scaling schedule, and it's one of those things, but that's one of the reasons they recommend or have a policy that you're supposed to sleep at the fuel dock so that you're well-rested so you can take it out, especially a summer night. It was clear. I don't think tiredness had anything to do with this accident. The other important thing, and I think it's important to realize, is that if Weston Pioneer had been there at 8 o'clock on a Friday evening, if the management had been there and they'd asked Captain Morse, are you too tired? Do you feel okay? He indicated that he would have said, I feel fine. I can do this. A situation where there's nothing that Weston Pioneer could do, they cannot determine how tired a master is. The only way they can determine that is by asking them. They have policies in place to make sure that he's well enough rested. In this case, to take a nap. He took a nap. He came back. If someone had asked him at that point in time, he would have said, I can go. The state steamship case was not cited because I really don't think the facts there were appropriate. I mean, the fact of the matter, that was an unseaworthy condition, that initially there was a limitation allowed, and then the court realized that the only due diligence for the thing was the person that was actually in the port. The person in the port should have been aware of the unseaworthy condition. And they therefore said, you cannot turn a blind eye on citing the linseed case. In all of those cases, there was an actual something that the owner should have seen or could have seen that would have indicated that the vessel was unseaworthy. In this case, we don't have that. We have a captain who was completely fit, who reported, indicated that he was fit, and did not appear tired. There's no evidence in the record that he appeared tired or did anything that indicated that he was tired. What he did is he made a mistake. It's Monday morning quarterbacking to say that he made that mistake because he was tired. He made a mistake. And the district court found that that mistake was the sole fraudulent cause of the collision. It rejected the argument that tiredness had anything to do with it. It specifically found that the vessel was seaworthy when it left port. And under the Limitation of Liability Act, which has been around for a long time, under those circumstances, Westman Pioneer is entitled to limit liability. This is not the Impreza when you had a guy that had been sick for months. This is not the armatura where you have the captain coughing for three weeks and self-medicating on codeine syrup. This is a case where you have a captain that's reporting for duty, fit, is actually fit. They ask him if he's doing okay. He's told he's doing okay. He's supposed to get a nap. He gets a nap. He leaves. And at the time he leaves, he thinks he can do his job. And if anyone had asked him, he would have told him he could have done his job. Briefly discussing the anti-subrogation rule. Well, you don't care whether you pay this half million dollars to Lucky Buck or ISI, do you? I'm sorry? If you're not limiting your liability and you're going to have to pay all of these extensive damages to Lucky Buck Barge, you don't care who you pay it to, do you? Well, I think the way the court ruled would be that if you reverse on the limitation action, I do think you have to go back to trials if there were issues as to the actual damages. But I do think the ruling is that ISI cannot recover their portion of the claim damages, because basically under the anti-subrogation rule, they are trying to sue their own insured. But you have to pay it to Lucky Buck. Well, as I said, Lucky Buck claims have been settled. We've settled out with Lucky Buck, and therefore there's no payment to them. I see. There was separate lawsuits originally. Originally there was a claim by Lucky Buck. There was a claim by the various underwriters. And the Lucky Buck claims have been settled. And so therefore, no one will get. Issue an ISI on that half million. Correct. Okay. Basically, I think what the argument that they made in the anti-subrogation thing is that they've paid the claim and they are free to walk away and then sue their insured. That position was specifically rejected by the Ninth Circuit in the National Union Fire Insurance case. That case was applying California law, but there's no real Washington law on point. The Washington law does recognize the anti-subrogation rule, and I don't see any reason for having to depart from the standard rule. Basically, the argument that there is no conflict of interest, I think, is precisely the one identified by the Court. When this accident happened, ISI, as the primary insurer, had an obligation to investigate it and to determine what happened. The way the policy worked, they tendered the limits to the excess, and the excess took over the defense of the claim. But the fact of the matter is, they initially made the determination, including their ability to defend the case, based on their investigation. Now, the appearance of a conflict of interest is that they will use facts determined in that investigation in the subsequent action where they try to sue their own insurer for the same loss that they provide liability insurance coverage for. That is simply not allowed. All of the cases cited by ISI have been distinguished in our brief, and I don't think there's any need for me to go through them over again here. They deal with situations that are totally different than this. I don't know if the Court has any other questions dealing with the facts, factual undertakings or anything like that. Well, thank you, Your Honors. All right. Thank you. Do you have some rebuttal? Your Honor, I understand that I have three minutes of rebuttal. Mr. Teresky has kindly agreed that I could have them all. First of all, with respect to the standard review, I think that it is clearly that the condition of this case was that the process was made possible by the circumstances that were set out by Judge De Novo. The trial judge knew that. He put the proximate cause statements in his conclusions law. Is proximate cause a question of facts or a question of law? It is a question of law when the facts are undisputed. It is a question. It doesn't matter whether he calls it conclusions of law or finding a fact. I think it's an indication that he knew, based on those facts, he was making legal conclusions. And it depends on whether or not the facts of the law are disputed or undisputed. If they're disputed, obviously, it's going to be a mixed question. Here, they are not disputed. It is a conclusion of law that he draws from those facts as to what was the cause. Add to that the burden of proof on Western Pioneer, heavy burden of proof. There is no negative finding in here that tiredness did not cause the collision. I overlooked paragraph 13 of conclusions of law. Yes. He says, Master Morris negligently failed to obey fundamental navigational rules. Right. Negligently failed. Absolutely. He failed. We agree. That's not disputed. Why did he fail? He failed because of Western Pioneer's policy to allow tired captains to go to sea. That's why he failed. It is not the conduct of Captain Morris that is at issue in a limitation action. It is the conduct of the owner that the court should focus on. And this owner did not have any policy. It had the big boy policy. We leave it up to the captain. It is the captain's responsibility to be sure the crew is well rested. That is not the law. It is the owner's responsibility when they have the ability to control. And here it would be a huge expansion, I believe, of the limitation statute to allow the big boy standard to prevail and say, Owners, you can leave it up to your captain when they're in their home port. We're going to protect you anyway. State steamship company is very important. Why? Mere instructions of respectable authority. Its owners have a duty to see that the vessel is made seaworthy. A neglect or failure to take such action will require denial of limitation. Mere instructions to subordinate employees will not suffice to give the owner the benefit of the limitation act. We have mere instructions. The port captain, the last time the port captain saw Captain Morris before he departed was 1240 p.m. in the afternoon. They never asked him. We don't know what he said he would have asked. They never did. This case should be reversed. The damages were tried in the lower court. The lower court should be instructed to enter judgment and make findings on damages. Those facts were put before the court. Thank you. All right. Mr. Gibson, thank you. We thank all counsel. This case is submitted for decision.
judges: Reavley , Tashima, Paez